[Crim. No. 1898.    Third Dist.    Oct. 9, 1945.]

THE PEOPLE, Respondent, v. WILLIAM ASHTON RILEY, Appellant.

J. Oscar Goldstein, J. N. DeMeo, Charles DeMeo, and Burton J. Goldstein, for Appellant.

Robert W. Kenny, Attorney General, James O. Reavis, Deputy Attorney General, Chas. J. McGoldrick, District Attorney, and Bernard C. Plover, Deputy District Attorney, for Respondent.

THOMPSON, J.—The defendant, William Ashton Riley, was indicted by the Grand Jury of Sonoma County for the crime of murdering Jessie L. Brassill, with whom he had been living for several years on her ranch in Rincon Valley as man and wife. He was convicted by a jury of manslaughter. It is contended, on appeal, that the corpus delicti was not proved and that there is no evidence of the deceased having died as the result of an injury sustained through any act or fault of the defendant.

Mrs. Jessie L. Brassill, a widow, who was about forty-five years of age, lived on a seven-acre ranch which she owned near Santa Rosa, in Sonoma County. She also owned stocks and securities of the par value of about $15,000. Her husband had been dead for several years. She had no children. Her property was subject to a revocable declaration of trust in which the Wells Fargo Bank & Union Trust Company of San Francisco was named as trustee.

The defendant was commonly called "Slim." He was fifty-three years of age and had formerly been a farmer and stockman. He had a wife and four children from whom he had been separated for six years or more. He was not divorced. He owned no property. He became acquainted with Mrs. Brassill about 1940, after which he lived with her on her Rincon Valley ranch as man and wife. He assisted in the management of the farm, claiming that they were partners.

On November 10, 1943, Mrs. Brassill executed her will, giving all of her property to the defendant, designating him as her friend. She appointed him executor of that will, without bonds. On February 8, 1944, she executed a declaration of trust with relation to all of her property, including the seven-acre Rincon Valley ranch, and the stocks and securities of the approximate par value of $15,000. The Wells Fargo Bank

was made trustee. Most of the residue of her estate was given to the defendant, and in the event of his death it was to be equally divided between Miles Riley, a son of the defendant, and Mary Roberts, a friend of the trustor.

Both the deceased and the defendant were addicted to the use of intoxicating liquor. She sometimes drank to excess. It appears that they usually lived in harmony. There is, however, some evidence to the contrary. Lawrence Keck, a neighbor, who frequently visited the Brassill ranch, testified that he once saw the defendant slap the deceased. Mrs. Ida Walker, another neighbor, who visited the Brassill home on numerous occasions, testified that she went there on June 26, 1944, to sell a war bond, and that while she was making out the bond Mrs. Brassill and the defendant were arguing over some matter, and the witness heard the defendant say to Mrs. Brassill, "Yeah, I will see you six feet under first." No explanation was made regarding that remark except that Mrs. Brassill then said: "I'm sore at Slim." Mrs. Evelyn Elliott, who was a friend of the deceased, was visiting her home on and after June 25th. She was the only eyewitness to the incident which occurred on June 27th between the defendant and Mrs. Brassill in the back yard of the premises over the removal of some calves, during which, the prosecution claims, the defendant struck or knocked Mrs. Brassill down, causing the injury above her left ear which the physicians testified resulted in her death four days later. The chief issue on this appeal is whether there is any evidence that the defendant caused the traumatic injury over the deceased's left ear, which the doctors testified resulted in hemorrhage of the brain or subdural hematoma and subsequent death.

■ Conceding that Mrs. Brassill died as a result of the injury over her left ear and that she sustained that injury during the episode over the removal of the calves, we are unable to find any evidence that it was inflicted by the defendant or that it was the result of an unlawful act of his or committed without due caution or circumspection. Unless the evidence affirmatively shows, or it may be reasonably inferred therefrom, that the acts of the defendant produced the death of Mrs. Brassill "in an unlawful manner, or without due caution or circumspection," it becomes necessary to reverse the judgment for lack of evidence. The evidence refutes the assumption that the defendant struck or kicked the deceased so as to cause the injury from which her death ensued. In fact there is no evidence as to how the injury was sustained.

She did not complain of that injury. When she arose and brushed the dirt from her clothing and walked to the house, Mrs. Elliott said that she passed her and that she was then "in normal condition." Evidently Mrs. Elliott saw no injury over the left ear. She did say "She had her left *eye* a little bit puffed up, I believe, but that was from a fall the night before." Her testimony clearly infers that the defendant pushed Mrs. Brassill away to protect her from being hurt by the calves, and not for the purpose of injuring her. Indeed she says the deceased was once knocked down by the rump of a fractious calf. The deceased had voluntarily gone out into the yard and attempted to take the calves away from the defendant. We have no way of determining whether she was injured as a result of being knocked down by the calf, or how she received the bruise over the left ear from which she died. It does not appear to be a reasonable inference which the jury was entitled to draw from the evidence that she received that injury as a result of the defendant's shoving her down, or that he did so without due caution or circumspection. Subdivision two of section 192 of the Penal Code defines involuntary manslaughter as death resulting from "the commission of an unlawful act, not amounting to a felony"; or "the commission of a lawful act which might produce death, in an unlawful manner, or without due caution or circumspection."

There is some evidence to the effect that on the afternoon of June 26th, while washing some milk cans in the basement, Mrs. Brassill stumbled and fell upon the concrete floor among the cans. We assume the inference intended to be drawn from that circumstance is that she may have then struck her head on the cans or on the concrete floor and thereby suffered the injury from which she subsequently died. But she then stated that she was not injured and asserted that she was absolutely all right. There was no evidence of an injury over the left ear or in the vicinity of the left temple prior to the affair with relation to the removal of the calves as above stated. Doctor Gertrude Van Steyn, the family physician of Mrs. Brassill, testified that on June 22nd she made a complete examination of Mrs. Brassill, who was her patient, and found her to be in first-class physical condition, with no apparent ailment or injury on her head or otherwise.

Mrs. Elliott appeared to be a favorable witness for the defendant. She saw the defendant go into the back yard about 10:30 in the forenoon of June 27th, toward the corral where

two calves were then chained to a fence. The witness was standing opposite the open basement door. She heard Mrs. Brassill call to the defendant and tell him to leave the calves alone, that she would feed them. He replied that they were his calves because he had paid for them, and that he was going to take them down to the cows to feed them. He proceeded to unhitch the calves and started to lead them away by means of the chains which were fastened about their necks. They were frantic and wild, and jumped about as he led them away with a chain in either hand. Mrs. Elliott then left the basement and went upstairs where she looked out of the window and saw the completion of that incident over the removal of the calves. In effect, she stated that Mrs. Brassill went into the back yard to protest against the defendant's removal of the calves and that as she approached the defendant pushed her away several times to prevent her from being hurt by the calves. Mrs. Elliott says that the defendant did not strike the deceased but that she was hit on one occasion by a calf which was plunging about and knocked her down; that the defendant pushed her away with his foot to protect her from the calves; that on one other occasion he placed his hand on her jaw and pushed her away, and that she then again fell to the ground; that she arose and brushed off her clothing and returned to the house, passing the witness as she went up to her room, without saying anything; that the witness saw her plainly and saw no evidence of any injury upon her head or face; that she complained of no injury; that Mrs. Brassill went into her bedroom and closed and locked the door. Several hours later the defendant inquired for Mrs. Brassill and upon being told that she had gone to her room he went upstairs and knocked at the door, but receiving no reply he forced the door open and found her lying on the floor by the side of the bed, unconscious. She then had an apparent injury over her left ear, "two or three inches in diameter." She was placed on her bed. Her physician, Doctor Gertrude Van Steyn, was immediately called to the house where she examined the patient. The doctor then found Mrs. Brassill suffering from an injury or bruise "on the left temple," together with several other bruises on her left ankle and right arm. The doctor testified that they appeared to be of recent occurrence because they were not of a yellow or green tinge. The patient was still unconscious and she was removed to the Sonoma County Hospital where she arrived at 5:30 p. m. She died four days later on July 1st. Doctor Harding Clegg performed an autopsy

and testified that the patient died as a result of "subdural hematoma with the contributing cause of bronchial pneumonia"; that he found a clot of blood of considerable size at the base of the brain caused by the traumatic injury over the left ear which pool of blood might have been accumulating for a period of several hours or even days before death ensued. Other physicians testified similarly. There is adequate evidence to assume death ensued from hemorrhage affecting the brain caused by the traumatic injury which was found over her left ear and in the vicinity of the left temple. We may also assume that the accompanying pneumonia which subsequently developed was merely incidental to the traumatic injury from which she really died.

The real question is whether there is any evidence, or reasonable inferences to be drawn therefrom, to indicate that the defendant caused the injury from which Mrs. Brassill died, by striking her with his fist or with the chains which he held in his hands, or by kicking her when she was on the ground, or by unlawfully shoving her so that she fell and struck her head upon some object, or that she was stepped upon or kicked by one of the calves while she lay upon the ground. We may even assume, in support of the judgment, that a quarrel existed between them over the removal of the calves and that the defendant was angry or unduly violent; that he did not act with due caution or circumspection. But the only eyewitness to the affair was Evelyn Elliott, a summary of whose evidence reads as follows:

"He (the defendant) told her to go back to the house. . . . She said they were her calves and he said they were his calves because he paid for them. . . . They (the calves) were jumping all around. . . . He was hanging onto the calves. Q. What did Mrs. Brassill do? A. She was trying to hang on both of them. . . . Q. What did you see, if anything, when you looked out the window? A. I seen Mr. Riley still hanging onto his calves. . . . Q. Now you stated that Mr. Riley pushed her. Is that correct? That is what you saw from the window? A. Pushed her back. . . . Q. Now what if anything else happened there? A. Well, the calves knocked her down. . . . She kept trying to get him to bring them back and he was trying to go down to the barn with them and they were milling around, as you say, and he kept trying to push her back out of the way. Q. Yes, and will you go on? A. Well, not very much more to tell. Q. What is there, if anything? A. Well, the calves

jumped into her and pushed her down. . . . Slim pushed her over out of the way a couple of times with his feet to keep her ——out of the way of the calves. . . . She was (then) on her knees. Q. On her knees? A. On her side. Q. Flat on the ground? A. No. . . . Her shoulders and head were up off of the ground. Q. How many times did he push her with his foot? A. About twice. . . . Q. And in what portion of her body did he push her with his foot? A. The hip. . . . She went over a little bit, not all of the way over. . . . Q. How did she get into that position, if you know? A. The calves knocked her down. Q. Did Mr. Riley knock her down at any time? A. He didn't knock her down, he pushed her away and she stumbled, she didn't fall flat. Q. What part of her body did he push? A. I think he put his hand alongside of her jaw and just pushed her back and she stumbled. . . . Q. She stumbled once? A. Yes. Q. What caused her to go to the ground the other time? A. The calves. . . . Swishing their hind quarters around. . . . Q. Did you observe whether or not Mrs. Brassill struck her head at any time during any of these falls? A. You mean the falls in the yard? Q. Yes. A. No. Q. After Mrs. Brassill had been on the ground . . . among these calves, did you see her get up at all? A. Well, she got up after Slim pushed her out of the way and brushed her clothes off and started towards the house. . . . Q. Did you see her walking toward the house . . .? A. Yes. Q. And you met her upstairs, is that right? A. Yes. Q. Describe her condition as you saw it when she came upstairs, . . . A. Normal. Q. She looked normal at the time? A. Just the same.''

As we have previously stated, several hours later the defendant inquired for Mrs. Brassill, and upon being told she had gone to her room, he went upstairs and finding the door locked he forced it open and found her lying unconscious on the floor beside her bed. There was some discussion as to whether she had taken sleeping pellets. A bottle of such pellets, which was nearly empty, was found on the window sill. Doctor Van Steyn was promptly called and came to the house. The patient was examined and taken to the county hospital in a comatose condition, where she was treated, but failed to regain consciousness, and died as a result of the injury over her left ear, four days later.

We are driven to the conclusion there is no adequate evidence to sustain the verdict and judgment that she died as a result of either a deliberate act of the defendant, or from a

lawful act performed in an unlawful manner, or without due caution or circumspection. The evidence leaves an uncertainty regarding the source of the injury from which Mrs. Brassill died. She may have died as the result of having been knocked down by the calf, or she may have received the injury which resulted in her death by falling from the bed, or she might have fainted and struck her head upon some object in her room as she fell. There is no evidence from which the jury could have inferred that she was injured as the result of the defendant's conduct.

The judgment is reversed and the cause is remanded.

Adams, P. J., and Peek, J., concurred.